Mr. Patosky, when you are prepared, you may proceed. Mr. Patosky, you may proceed. May it please the court, counsel. I'm Adam Patosky on behalf of the appellant Ryan Wolterman who appeals from the grant of summary judgment in favor of the appellees on his wrongful seizure claim and the denial of his motion for summary judgment on the same matter. Shortly after Deputy Syverson arrived at the captain's getaway in response to a report of a fight occurring in front of the bar. An unidentified and unrecorded female witness told him that an individual who was walking down an alley that he estimated was approximately a hundred yards away. The woman told him that gentleman in the green sweatshirt was involved in the fight. She specifically told him, having witnessed the fight, that the individual was wearing a green sweatshirt. Deputy Syverson then proceeds to get into his car, try to track that gentleman down. Spends about five minutes both in his vehicle and on foot, five minutes total between the two. Searching the residential neighborhood behind the bar locations trying to find a man in a green sweatshirt. As he is driving back past the streets where the individual was originally pointed out to him, he first observes Ryan Walterman coming up the street near where another officer had parked their vehicle closer than a hundred yards away. Deputy Syverson puts his car in reverse, backs up, goes down the street, stops Ryan Walterman closer to captain's getaway than where he'd originally witnessed the individual in the green sweatshirt. And immediately seizes him, telling him to stop and asking him, were you involved in the fight? In response, Ryan Walterman says calmly, no, I wasn't involved, but I saw it. At this point a second officer, Officer Haas, is coming up the sidewalk. It was Officer Haas's car that Ryan Walterman had been walking past when he was first observed by Deputy Syverson. At this point, Deputy Syverson has told Ryan to take his hands out of his coat pockets. He does. When Haas approaches, Deputy Syverson asks, what did you see? To which Ryan responds, I saw a guy talking mess to a group of people and then a fight happened. Deputy Syverson asks for his identification. Ryan says, maybe I have it on me, but I don't have to give it to you since I was not involved. An individual does not have to provide identification to an officer in a voluntary stop, if that's what it was. We contend that he was seized immediately, but it's arguable that it was a voluntary stop at that point. Why would it be an immediate seizure just based on an investigatory? He's looking for somebody, there's somebody to talk to. What makes that a seizure? The issue is that if an individual believes that they are not free to leave when an officer is approaching and is talking to them, then that is a detention. And that can be determined based on the factors of the officer's tone, the language he uses, his demeanor towards the individual who he's approaching. Those are all factors that tie into whether the individual being approached believes they can leave or not. We believe that those factors indicate that Ryan understood from the start that he wasn't free to leave. However, the moment he says, maybe I have ID, but I don't need to give it to you, it ceases to be a voluntary stop, if it ever was one, with Ryan being told, you are involved and if you want to play games, you can go to jail, that's fine. At that point, it's clear that he is not free to leave. Moments after that, it is admitted that when Deputy Syverson shines his flashlights on Ryan, Ryan's not wearing a green sweatshirt, he's wearing a brown car heart front zip jacket. So no later than that, it's known that the one, that the primary, excuse me, the one piece of evidence that he, Deputy Syverson, could have relied on to justify the stop, the identification from the unknown female witness who's never seen again, he's not even, he's not wearing the green sweatshirt that he was told, that Deputy Syverson was told the individual involved was wearing. At that point, there was no, there was no even arguable, reasonable suspicion to continue detaining him. Rather than let him go. Were there other descriptions, other descriptive features of the suspect given beside the color of the garment? The only description that is in the record is that the individual involved was wearing a green sweatshirt. That is the entirety of the description that is known in the record. There's, they argue about the color of his jacket. They, he's accused of having, Ryan is accused by Deputy Syverson of having red and swollen knuckles to which Ryan responds by holding his hand up for Deputy Syverson to see and saying, these look red and swollen to you, you don't know your colors. At that point, Ryan testified in his deposition that Deputy Syverson nodded his head to Haas. Haas, you can see on the video, Haas tucks his flashlight under his arm. Ryan says, are you going to arrest me? Which Deputy, which Officer Haas says, you're not being, you're not being arrested. You're being detained. Ends up putting the handcuffs on him. At that point, the C, the, any investigative stop is over. This is now a de facto arrest. The use of handcuffs in this situation, with no indication that Ryan was a threat to safety, was armed. You had two officers at the scene. In fact, the Seeley case sets out the factors the court considers for when a de facto arrest occurs from an investigatory stop. With the number of officers compared to the number of individuals involved. In this case, it was two officers to one cooperative detainee. The nature of the crime and suspicion whether the individual was armed. There'd been a weaponless fight. Ryan had not been frisked, but he was allowed to put his hands back into his pockets, unzip his coat, take out his wallet with no objection from either officer at the scene. So there was no suggestion that either one of them thought that it was a chance that Ryan was armed. The need for immediate action. They, at this point, they had confirmed his identification. It had come back clean. They had his address and you'll see, and subsequent to his, to his arrest, they let another individual who had been identified by multiple witnesses being involved, go. There was no, there was no need for immediate action. Any suspicious behavior or movements. Ryan stopped when commanded. He had initially declined to give ID, but did upon being threatened with arrest. He responded to... So you're within your rebuttal time. Yes, and I'll be stopping here briefly. He had responded to false statements, the false accusations against him and up until the point where he'd been falsely accused. Being involved, he had been fully cooperative. And it was whether there was an opportunity to stop and less threatening, to conduct the stop and investigation in less threatening circumstances. There was every opportunity. They could have voluntarily asked him to go, to walk back to the scene. They could have found the witness who identified the individual in the first place. In fact, shortly after going back to the scene, Deputy Syverson was told explicitly that in person is not involved. He said, he said it was irrelevant because he was being arrested for public intoxication based on no information whatsoever. And I will reserve my time for rebuttal. Mr. Clawson. Thank you, Your Honor. May it please the court, counsel. Good morning. My name is Zach Clawson. I represent Deputy Sean Syverson, Dickinson County and Sheriff Greg Balloon in this lawsuit. This case involves an officer responding quickly to a late night bar fight, acting on a witness tip and conducting a brief and temporary investigative stop. The record evidence, including the body camera footage in this case, confirms that Deputy Syverson acted lawfully and reasonably and that neither he, the county, nor the sheriff violated the plaintiff's constitutional rights and that they're entitled to qualified immunity. On November 8th, 2020, in the early morning hours, Deputy Syverson responded to a call for a late night bar fight outside of the captain's getaway bar in Arnold's Park. And when he arrived, a witness told him that a male had fled the scene and that this person was believed to be wearing a green colored sweatshirt. The witness pointed towards the male that was walking down an alley believed to be roughly a hundred yards away from where Deputy Syverson was at at that time. In response to this, Deputy Syverson gets in his car, he drives down the alley and he's unable to find this person who he believed either fled or was hiding in the area. The district court in its order said that the statement about the color of the shirt was not a material fact. What's your explanation for the court's conclusion? And I didn't really see the court explain why it wasn't a material fact other than the footnote that simply declares that. Yes, your honor. So if you look at the body camera footage in this case, when he actually pulls up to the plaintiff, Ryan Wolterman, it's dark out in the area. So he pulls up and it's dark out. The fact that the jacket might have been brown versus olive green is not a material fact because this court's noted in the United States v. Slater. One discrepancy between the suspect's description and an individual's appearance does not vitiate reasonable suspicion that otherwise exists under the circumstances. This court has repeatedly held that the encounter for reasonable suspicion must be observed under the totality of the circumstances test. And for qualified immunity, the standard is arguable reasonable suspicion that a reasonable officer could have believed that he had reasonable suspicion for the stop. The factors that the court looks at, I think this was United States v. Lemons, they look at the time of day. Excluding the color, what were the reasonable observations of the officer that would give him a reason to stop this person? In addition to the color of the sweatshirt or the coat, the officer testified that he had the same type of jacket that he observed on this witness or on the suspect walking or running down the alley. He also indicated that it was the same type or build of person that he saw in the alley before he got in the car and then before he got out on foot and unable to locate him. This is also within five or so minutes. And so the officer wasn't relying just on what the witness said the color was. The officer actually saw the individual at a distance?  Then he gets in his car, and I apologize for interrupting. Then he gets in his car, drives down the alley, thinks this person is either hiding or had fled further. He gets out on foot. He's unable to locate him within a couple of minutes, gets back into his car and sees a person that appears to be matching the description. In addition, we've got the temporal and geographic proximity to the bar here. So based on those facts viewed as a whole, the deputy had reasonable suspicion or at minimum, arguable, reasonable suspicion for this limited two minutes and 40 or 41 second stop of the plaintiff in this case. Now, counsel and the plaintiffs want to focus on everything that happened afterwards. But the decision to handcuff the plaintiff here was made by Officer Haas of the Milford Police Department. His rationale for that was that he wanted to handcuff him and detain him to bring him back to the scene of the bar to the Arnold's Park officer who is actually conducting the investigation in this case. After they walk back to the bar, it's Officer Haas who walks the plaintiff back to the bar. The plaintiff is released to the Arnold's Park officer and in the Arnold's Park officer's custody. Deputy Syverson no longer has any sort of involvement in this interaction. He was not involved in the decision to arrest the plaintiff. He was not consulted whether the plaintiff was going to be arrested. And this claim that Deputy Syverson arrested him or prolonged the detention is just completely contradicted by the body cam footage. In this case, which is uncontradicted. This is not a case where this court has found or hour or three hour detentions are unreasonable. This is two minutes and 41 seconds of detention here with Deputy Syverson before he's handcuffed by the other officer and then ultimately arrested by the Arnold's Park officer in this case. The district court said that Syverson didn't affect the arrest, right? Correct, Your Honor. And we hear subsequently, counsel argued that there was some sort of a signal. What's that? Does that create a fact question? I don't believe it does, Your Honor. So if you look at the body camera footage in this case, at the point in time when the Milford police officer, Officer Haas is about to handcuff the plaintiff. Both he and the plaintiff are actually looking in the opposite direction than Deputy Syverson's body camera footage in this case. If you also look at the sequence of pleadings in this case and started with the plaintiff suing the Arnold's Park officer and the Milford police officer. In that case, he indicated that Officer Haas stopped plaintiff and Officer Haas handcuffed him. In the first petition in this case, before we filed the motion to dismiss, it indicated that Deputy Syverson handcuffed him and Deputy Syverson arrested him. It's only after we filed the motion to dismiss based on the body camera footage in this case that we've now heard this story that Deputy Syverson signaled to Officer Haas to arrest him. I don't believe that it's supported by the body camera footage in this case. And again, from a body cam standpoint, Deputy Syverson's involvement here is two minutes and 41 seconds. And at which point he goes back to the bar to interview additional witnesses. He is not the arresting officer. He's not the officer who ends up bringing charges against him. We don't believe that this claim from the plaintiff that he believed that Deputy Syverson shook his head up and down in affirmance of the arrest is a material fact, precluding summary judgment. There's also a claim here that the plaintiffs believe that Deputy Syverson had some sort of duty to intervene. Once he realized that the Arnolds Park officer was going to be arresting him for public intoxication, the Eighth Circuit has held, I think it's Slivers v. Shank is the case, that there's no constitutional duty to intervene outside of the excessive force context. There's no excessive force claim here. There's no duty to intervene. And again, once the deputy gets back near the bar and is interviewing witnesses, it's 20 or so minutes between that time and when the Arnolds Park officer arrests him. He doesn't know what happened during that 20 minute time. And he, again, had no input in the decision to arrest him. Did I understand you to say there was a separate case against Haas and Youngblood? Correct, Your Honor. There was an initial case, and I believe that some of this is in the record. There was an initial case against the Milford officer, which ended up settling prior to the plaintiff filing this current action against the deputy. And I wondered why there weren't parties here. Yes, Your Honor. That case is done, and this case is only against the deputy and the county. I do want to touch briefly on the state law false arrest claim. First, as I've iterated throughout and it's in our briefing, we don't believe that Deputy Syverson ever conducted any sort of arrest of Mr. Wolterman to give rise to a state law false arrest claim. The plaintiffs would want to claim that probable cause is required for a state law false arrest claim. As it relates to a temporary detention, the standard for a temporary investigative detention is reasonable suspicion. If the court looks at the Wilson v. Lamp case, which, Judge, I believe you were on the panel on, the standard for reasonable suspicion under Iowa law is the exact same under federal law. So just like the constitutional claims fail, the state law false arrest claim fails as well. Just getting briefly to the... Let me go back. Is Officer Haas in a different police department? Correct. So Deputy Syverson's with the Sheriff's Office. Officer Haas is with the Milford Police Department. And the arresting officer is the... So there's no chain of command relationship between them? Correct. Not at all, Your Honor. There's three different departments servicing this small area that is considered Arnold's Park in the Okoboji area. I see that my time has concluded. I respectfully ask that the court affirm the judgment of the district court. Thank you. Thank you, Mr. Clausen. Mr. Witowski, your rebuttal. Thank you, Your Honor. Of course, Deputy Syverson's body cam doesn't show him nodding. It's his body camera. Ryan Walterman testified in his deposition that he saw a signal. Wait, wait, wait. He also said they were facing the opposite direction. If you look around the minute 656, the time stamp of the video, that is when the circumstances began. You'll see that it's right after Ryan challenges him about his red and swollen knuckles, Ryan Walterman and Officer Haas are both looking at Syverson. There's a pause. Ryan Walterman turns his head, looks at Haas. Haas looks at the ground, tucks his flashlight. Ryan says, are you going to arrest me? In the moment before they turned their heads, before Ryan turned his head to look at Haas, Haas is staring at Syverson, and we believe that is the moment where there is a signal that is unpicked up on Deputy Syverson's body cam. That is what Ryan testified to in his deposition. Is there any evidence that he had the authority to order an officer of a completely different police department to do anything? The record indicates that these officers regularly work together to police the community. They're familiar with each other, and it is not uncommon for them to be all interacting in the same investigation. So while there was not a direct chain of command there, there was a long history of a working relationship, I believe, that is set out in the record. I see my time is up. Thank you. Thank you, Mr. Witoski. Thank you also, Mr. Clausen. The court appreciates both counsel's participation and argument before us. We will continue to study the matter.